# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 80
Sutton 58 Associates LLC,
  Appellant,
   v.
Philip Pilevsky, et al.,
  Respondents.

Ronald S. Greenberg, for appellant.
Robert S. Smith, for respondents.
American College of Mortgage Attorneys, New York Bankers Association, Melanie L. Cyganowski, Bullard Law Group, PLLC, Legal Services NYC Bankruptcy Assistance Project, and Brooklyn Bar Association Volunteer Lawyers Project, amici curiae.

STEIN, J.:

On this appeal, we are asked to determine whether federal bankruptcy law preempts plaintiff's state law claims asserted against non-debtor third parties for tortious interference with a contract. Giving due consideration to the presumption against preemption, we hold that plaintiff's state law claims are not preempted under the circumstances presented here.

- 1 -

I.

Plaintiff Sutton 58 Associates, LLC loaned $147,250,000 to nonparties BH Sutton Mezz LLC (Mezz Borrower) and Sutton 58 Owner LLC (Mortgage Borrower) (collectively, the borrowers) in order to finance the development and construction of an apartment complex on a Manhattan property owned by Mortgage Borrower. Mezz Borrower owned 100% of the membership interest in Mortgage Borrower. The loan contracts consisted of a mezzanine loan agreement between plaintiff and Mezz Borrower, as well as acquisition and building loan agreements between plaintiff and Mortgage Borrower. These agreements forbade the borrowers from incurring any debt other than short-term trade debt, from acquiring any unrelated assets and from engaging in other business, and compelled them to remain "Special Purpose Bankruptcy Remote" entities.[1] The agreements also prohibited the sale or transfer of any direct or indirect interest in either the property or the borrowers without plaintiff's consent. It is undisputed that these provisions were intended to ensure that, if the borrowers filed for bankruptcy, they would be single-asset real estate entities and the bankruptcy process would, at the very least, be expedited.[2] Plaintiff and Mezz Borrower also entered into a pledge and security agreement,

---

[1] As defined in the agreements, a special purpose bankruptcy remote entity is one which, among other limitations, is organized for the sole purpose of owning property, engages in no unrelated business, and holds no unrelated assets.

[2] The Bankruptcy Code defines single asset real estate as "real property constituting a single property or project, other than residential real property with fewer than [four] residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto" (11 USC § 101 [51B]). When a debtor is a single asset real estate entity, the Bankruptcy Code

in which Mezz Borrower pledged its 100% membership interest in Mortgage Borrower as collateral for the mezzanine loan. This agreement gave plaintiff the right to foreclose upon and sell that membership interest—and, by extension, the development site—in the event of a default.

When the loans matured in January 2016, the borrowers defaulted. Plaintiff issued notices of default and sought to conduct a UCC foreclosure sale of Mezz Borrower's membership interest in Mortgage Borrower pursuant to the pledge and security agreement. Shortly before the scheduled sale, the borrowers unsuccessfully moved in Supreme Court for a preliminary injunction to block the sale. A few days after Supreme Court ordered that the sale proceed at the end of February 2016, Mezz Borrower filed a voluntary petition for chapter 11 bankruptcy in federal court.

Plaintiff initially moved to dismiss Mezz Borrower's bankruptcy petition on the ground that it was filed in bad faith or, alternatively, sought to lift the automatic stay imposed under bankruptcy law in order to permit plaintiff to pursue the sale.[3] Thereafter, in April 2016, Mortgage Borrower separately filed a voluntary petition for chapter 11 bankruptcy in federal court. After the Bankruptcy Court commented that plaintiff's motion

---

provides for expedited filing of a reorganization plan or the commencement of payments to a creditor in order to avoid lifting of the automatic stay and foreclosure on the property (*see* 11 USC § 362 [d] [3]).

[3]  The filing of a bankruptcy petition "operates as a stay" of, among other things, any actions or proceedings against the debtor that were or could have been commenced before the bankruptcy proceeding, the enforcement of judgments already obtained against the debtor, and any acts to obtain or exercise control over the property of the bankruptcy estate, create or enforce a lien against the property of the estate or debtor, or to collect or recover a claim against the debtor that arose before the bankruptcy proceeding (11 USC § 362 [a]).

to dismiss Mezz Borrower's bankruptcy petition was "premature," plaintiff withdrew that motion without prejudice. Plaintiff did not seek to renew the motion during the bankruptcy proceedings or otherwise move to dismiss Mortgage Borrower's bankruptcy petition.

The bankruptcy cases were consolidated for joint administration. Plaintiff cooperated with a creditors' committee to develop and file a joint plan of liquidation. As part of the plan of liquidation, an auction sale was held in December 2016, during which plaintiff placed the winning credit bid—in the amount of $86 million—for the project site.[4] In early 2017, plaintiff and the borrowers' other creditors voted to accept the plan of liquidation, which Bankruptcy Court confirmed.

Meanwhile, in September 2016, plaintiff commenced this action in state court against defendants Philip Pilevsky, Michael Pilevsky, Seth Pilevsky, Prime Alliance Group Ltd., and Sutton Opportunity LLC—various affiliated persons and entities—alleging that defendants had tortiously interfered with the loan agreements between plaintiff and the nonparty borrowers. According to plaintiff, defendants had engaged in a scheme to obtain an ownership interest in the development project in violation of the loan agreements. Plaintiff averred that, as part of this alleged scheme, defendants loaned $50,000 to Mezz Borrower to retain counsel, transferred three rental apartments to Mortgage Borrower so that it would no longer be a single asset real estate entity, and sold a 49% interest in BH Sutton Owner LLC—the parent company of Mezz Borrower—to a Pilevsky entity, thereby transferring to defendants an indirect interest in the borrowers and the development

_____

[4] Plaintiff submitted documents indicating that, by comparison, the appraisal value of the property at the time of the planned foreclosure sale was approximately $180 million.

project.[5]  Plaintiff asserted that these actions violated the covenants in the loan agreements prohibiting the borrowers from incurring non-permitted indebtedness, owning other assets, and transferring any interest in the borrowers, as well as those provisions requiring the borrowers to remain special purpose bankruptcy remote entities.  With respect to damages sustained, plaintiff asserted that the conduct of defendants delayed its ability to exercise its contractual remedies—because the bankruptcy proceeding was more protracted due to the borrowers no longer qualifying as single asset real estate entities and having taken on another creditor[6]—which, in turn, resulted in a significant loss in value of the development site.

Defendants moved for summary judgment dismissing the complaint, as relevant here, on the ground that the action was preempted by the Bankruptcy Code.  Supreme Court denied the motion, holding that the action was not preempted because it "d[id] not involve the bankruptcy" and, instead, defendants were alleged to have interfered with "separate contractual agreements."  On defendants' appeal, the Appellate Division reversed and granted defendants' motion based upon its conclusion that plaintiff's claims were preempted by federal law because "plaintiff's damages [arose] only because of the bankruptcy filings" (168 AD3d 477 [1st Dept 2019]).

---

[5]  The only defendant that participated in the underlying bankruptcy proceeding was Prime Alliance with respect to its loan to Mezz Borrower.

[6] The loan was not alleged to be tortious on the basis that it facilitated the bankruptcy. Rather, the loan allegedly violated the borrowers' covenants not to accept any liabilities other than "Permitted Indebtedness," which provisions in the loan agreements were intended to minimize the number of the borrowers' creditors.

Plaintiff appealed to this Court as of right (*see* CPLR 5601 [b] [1]).

II.

Plaintiff argues that the Appellate Division erroneously held that its tortious interference claims are preempted by federal bankruptcy law. Plaintiff contends that neither field nor conflict preemption precludes a New York court from adjudicating its tort claims, observing that the borrowers' bankruptcy proceedings were successfully concluded and that plaintiff's action against defendants—who were not the debtors in the bankruptcy proceeding—did not pose any obstacle to resolution of those proceedings. Plaintiff does not dispute that so-called bad-faith filing claims, or other tort claims premised upon conduct *within* a bankruptcy proceeding, may be preempted. However, plaintiff asserts that a distinction has been, and should be, drawn between such claims and those that, as here, allege wrongful conduct by non-debtor defendants that occurred prior to the bankruptcy proceeding and that are grounded in independent contractual obligations. According to plaintiff, preemption would unfairly deprive it of any judicial forum or remedy for defendants' alleged wrongdoing and would upset the expectations of numerous lenders for large-scale real estate projects governed by similar loan agreements.

In response, defendants urge us to uphold the dismissal of plaintiff's claims on preemption grounds. Defendants contend that federal law has occupied the field of bankruptcy, to the exclusion of state law remedies. Defendants also assert that allowing plaintiff's tort claims to proceed in state court would conflict with federal bankruptcy law because the potential liability against third parties would discourage lending to, and counseling for, debtors—thereby indirectly chilling bankruptcy filings. As for plaintiff's

remedies, defendants argue that they are limited to those available against the debtors in the bankruptcy proceeding—namely, a motion to dismiss the proceeding or for relief from the automatic stay imposed under bankruptcy law.

Although the parties cite varied case law from across the country relating to preemption in the bankruptcy context, no controlling precedent answers the question before us. Defendants' preemption arguments are not wholly implausible. Nevertheless, defendants ultimately "bear[] the 'considerable burden' of overcoming the presumption that Congress did not intend to preempt" plaintiff's tortious interference claims (*Nealy v US Healthcare HMO*, 93 NY2d 209, 218 [1999], quoting *De Buono v NYSA–ILA Medical and Clinical Services Fund*, 520 US 806, 814 [1997]). For the reasons discussed herein, we conclude that defendants have not met that burden.

### III.

The United States Constitution empowers Congress to establish uniform laws[7] on the subject of bankruptcy (*see* US Const art I, § 8, cl 4), and Congress has effectuated this power by enacting the Bankruptcy Code (*see* 11 USC 101 *et seq.*). The Supremacy Clause, in turn, provides that federal law "shall be the supreme Law of the Land and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const art VI, cl 2). Therefore, "when federal and state

---

[7] "The uniformity requirement is not a straightjacket that forbids Congress [from] distinguish[ing] among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner" (*Railway Labor Executives' Assn. v Gibbons*, 455 US 457, 469 [1982]). Furthermore, "uniformity does not require the elimination of any differences among the States in their laws governing commercial transactions" (*id.*).

law conflict, federal law prevails and state law is preempted" (*Murphy v National Collegiate Athletic Assn.*, 584 US ___, ___, 138 S Ct 1461, 1476 [2018]).

Preemption of state law may occur by express statutory provision or through implication, the latter of which may be accomplished through either federal preemption of the field of a particular subject matter or the existence of an irreconcilable conflict between federal and state law (*see Doomes v Best Tr. Corp.*, 17 NY3d 594, 601 [2011]; *Balbuena v IDR Realty LLC*, 6 NY3d 338, 356 [2006]; *Murphy*, 584 US at ___, 138 S Ct at 1480). "Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation'" (*Murphy*, 584 US at __, 138 S Ct at 1480, quoting *R. J. Reynolds Tobacco Co. v Durham County*, 479 US 130, 140 [1986]; *see People v First Am. Corp.*, 18 NY3d 173, 179 [2011]) or where there is a "'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject'" (*Arizona v United States*, 567 US 387, 399 [2012], quoting *Rice v Santa Fe Elevator Corp.*, 331 US 218, 230 [1947]). Conflict preemption, on the other hand, has been found "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the latter of which is often referred to as obstacle preemption (*Freightliner Corp. v Myrick*, 514 US 280, 287 [1995] [internal quotation marks and citations omitted]; *see Balbuena*, 6 NY3d at 356). These categories "are not rigidly distinct" and, regardless of the type of preemption urged, "a litigant must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law" (*Virginia Uranium,*

*Inc. v Warren*, ___ US ___, ___ 139 S Ct 1894, 1901 [2019] [internal quotation marks and citations omitted]).

Ultimately, any preemption analysis requires that we "ascertain the intent of Congress" (*Doomes*, 17 NY3d at 601 [internal quotation marks and citation omitted]; *see Wyeth v Levine*, 555 US 555, 565 [2009]). "[B]ecause the States are independent sovereigns in our federal system," the United States Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action" (*Medtronic, Inc. v Lohr*, 518 US 470, 485 [1996]). Furthermore, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' [courts must] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress'" (*id.*, quoting *Rice*, 331 US at 230; *see Hillsborough County v Automated Medical Laboratories, Inc.*, 471 US 707, 716 [1985]). As the Supreme Court has acknowledged, "there is no question that States possess the 'traditional authority to provide tort remedies to their citizens' as they see fit" (*Wos v E.M.A.*, 568 US 627, 639-640 [2013], quoting *Silkwood v Kerr–McGee Corp.*, 464 US 238, 248 [1984]; *see CTS Corp. v Waldburger*, 573 US 1, 19 [2014]). The presumption against preemption applies to preemption in the bankruptcy context (*see BFP v Resolution Trust Corporation*, 511 US 531, 546 [1994]), and defendants here must overcome "'the starting presumption that Congress does not intend to supplant state law'" (*De Buono*, 520 US at 814, quoting *New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 US 645, 654 [1995]).

Looking to congressional intent in regulating bankruptcy, the principal purposes of the Bankruptcy Code are to give a "'fresh start' to the 'honest but unfortunate debtor'" (*Marrama v Citizens Bank of Mass.*, 549 US 365, 367 [2007], quoting *Grogan v Garner*, 498 US 279, 286, 287 [1991]) by "provid[ing] a procedure by which . . . insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt'" (*Grogan*, 498 US at 286, quoting *Local Loan Co. v Hunt*, 292 US 234, 244 [1934]).  The Bankruptcy Code also aims to allow corporations to restructure so as to avoid liquidation (*see generally NLRB v Bildisco & Bildisco*, 465 US 513, 528 [1984]; *United States v Whiting Pools Inc.*, 462 US 198, 203 [1983]), and to ensure fair distribution of the bankrupt estate to creditors (*see Union Bank v Wolas*, 502 US 151, 161 [1991]; *Katchen v Landy*, 382 US 323, 328-329 [1966]).

To advance these congressional purposes, the Bankruptcy Code contains an intricate and comprehensive framework governing voluntary and involuntary bankruptcy filings for various persons and entities.  The statutory scheme governs the filing and adjudication of bankruptcy petitions, creditor claims, adversary proceedings and counterclaims.  Although the Bankruptcy Code incorporates state law in various respects, the Code generally prescribes which debts are dischargeable and which claims are allowable, as well as administration of the entire bankruptcy process.  Further, the Code empowers the Bankruptcy Court to prevent litigants from misusing the bankruptcy process by authorizing the court, among other things, to address abuses of process (*see* 11 USC § 105 [a]), dismiss certain petitions for abuse (*see e.g.* 11 USC §§ 303 [i] [2]; 707 [b]; 1112), grant relief from

the automatic stay (*see* 11 USC § 362 [d] [1]), or issue sanctions for willful violations of the stay (*see* 11 USC § 362 [k] [1]).

IV.

With the foregoing background in mind, we turn to application of the preemption doctrine to the facts of this case. Defendants make no claim of express preemption. Further, while defendants argue that field preemption precludes assertion of plaintiff's tort claims in state court due to the comprehensive federal regulation of bankruptcy proceedings, in our view, this contention does not merit extended discussion. Certainly, the Bankruptcy Code thoroughly governs the litigation and settlement of controversies between debtors and creditors in connection with the bankruptcy estate; after all, Congress granted to federal District Courts "exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11" (28 USC § 1334 [a], [b]), which they typically refer to Bankruptcy Courts (*see* 28 USC § 157 [a]). Indeed, the Bankruptcy Code generally sets out the law that applies to bankruptcy petitions and claims filed in each bankruptcy case. However, defendants cite no provision of the Code that suggests a congressional intent to interfere with the authority of state courts to provide traditional tort remedies for claims brought by a *non-debtor* against alleged *non-debtor* tortfeasors for interference with contractual agreements that exist independently of a bankruptcy proceeding (*cf. Balbuena*, 6 NY3d at 357). In fact, defendants concede that the Bankruptcy Code would provide no remedy for plaintiff's claims as asserted against defendants. To be sure, congressional silence as to remedies against third parties may not be dispositive. However, defendants

point to nothing in the language, structure, or history of the Bankruptcy Code to support their contention that—in addition to occupying the field of bankruptcy adjudication as between debtors and creditors—Congress clearly and manifestly expressed an intent to encroach upon the state's dominion by foreclosing tort remedies for claims that are not asserted by or against a debtor and do not affect the bankruptcy estate, thereby removing all available judicial recourse for plaintiffs injured by tortious conduct of non-debtors if there is any tangential connection to a bankruptcy proceeding (*see Rosenberg v DVI Receivables XVII, LLC*, 835 F3d 414, 419 [3d Cir 2016]). To the extent that federal law occupies the field of bankruptcy, the state law claims presented here do not trigger such preemption because they do not implicate debtor-creditor disputes relating to the bankruptcy estate.

The more complex question is whether plaintiff's tortious interference claims are impliedly preempted in accordance with principles of conflict preemption insofar as defendants suggest that permitting such claims to proceed in state court will undermine the accomplishment and execution of the full purposes and objectives of the Bankruptcy Code. "What is a sufficient obstacle [for purposes of preemption] is a matter of judgment, to be informed by examining the federal [law] as a whole and identifying its purpose and intended effects" (*Crosby v National Foreign Trade Council*, 530 US 363, 373 [2000]). Significantly, "the conflict between state law and federal policy must be a sharp one" and "federal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together" (*Figueroa v Foster*, 864 F3d 222, 235 [2d Cir 2017] [internal

quotation marks and citations omitted]; *Witco Corp. v Beekhuis*, 38 F3d 682, 687 [3d Cir 1994]; *see also Boyle v United Technologies Corp.*, 487 US 500, 507 [1988]).

In their bid for dismissal of plaintiff's claims, defendants do not identify any specific Bankruptcy Code provisions that have preemptive effect. Instead, defendants cite to various court cases addressing bad-faith filing or abuse of process claims, and analogize plaintiff's tortious interference causes of action to such claims. In that regard, courts have most often confronted preemption in the bankruptcy context in relation to attempts by creditors and debtors to lodge state tort claims against each other for malicious prosecution or abuse of process, alleging bad-faith filings in a bankruptcy proceeding or wrongful conduct within that proceeding. Judicial authorities are divided on whether such claims are preempted. However, it is fair to say that the majority of courts have held that such tort claims—those premised upon a bankruptcy filing, itself, or other alleged wrongful conduct within a bankruptcy proceeding—are preempted (*see e.g. Metcalf v Fitzgerald*, 333 Conn 1, 3, 214 A3d 361, 365 [2019], *cert denied* ___ US ___, 140 S Ct 854 [2020]; *Longnecker v Deutsche Bank Nat. Tr. Co.*, 842 NW2d 680 [Iowa Ct App 2013]; *PNH, Inc. v Alfa Laval Flow, Inc.*, 2011-Ohio-4398, ¶ 31, 130 Ohio St 3d 278, 285, 958 NE2d 120, 127 [2011]; *Stone Crushed Partnership v Kassab Archbold Jackson & O'Brien*, 589 Pa 296, 303, 908 A2d 875, 880 [2006]; *Pertuso v Ford Motor Credit Co.*, 233 F3d 417, 426 [6th Cir 2000]; *Smith v Mitchell Const. Co., Inc.*, 225 Ga App 383, 386, 481 SE2d 558, 561 [Ga Ct App 1997]; *MSR Expl., Ltd. v Meridian Oil, Inc.*, 74 F3d 910, 911 [9th Cir 1996]; *Gonzales v Parks*, 830 F2d 1033, 1035 [9th Cir 1987]; *but see Graber v Fuqua*, 279 SW3d 608, 613-614 [Tex 2009]; *U.S. Express Lines Ltd. v Higgins*, 281 F3d 383, 393 [3d Cir 2002]).

We need neither adopt nor reject the reasoning of these courts to resolve the instant appeal. It suffices to say that, where a tort claim is premised upon a bankruptcy filing, itself, or on conduct that occurs within a bankruptcy proceeding and under the purview of the Bankruptcy Court, the obstacle presented by state tort remedies is more readily discerned. Parallel tort actions in state court against a debtor or creditor based on that party's alleged wrongful conduct in a bankruptcy proceeding risks subverting the Bankruptcy Court's authority to adjudicate the validity of bankruptcy filings, or otherwise producing inconsistent standards or outcomes between state and federal law. Indeed, the Bankruptcy Code provides remedies for such claims as asserted between debtors and creditors by, for example, authorizing dismissal of bad-faith filings and empowering the Bankruptcy Court to take measures to prevent any abuse of process. While some courts have reasoned that "[s]tate courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one" (*Gonzales*, 830 F2d at 1035; *see e.g. Metcalf*, 333 Conn at 13, 214 A3d at 370), in our view, this same obstacle is not presented under the circumstances here because no question is raised as to the propriety of the bankruptcy proceedings. Plaintiff's tortious interference claims—asserted against defendants who were not debtors in the bankruptcy proceedings and which are premised upon conduct that occurred prior to those proceedings—are peripheral to, and do not impugn, the bankruptcy process.

Significantly, plaintiff seeks to sue non-debtor third parties for alleged wrongful conduct that occurred prior to, and separate from, the bankruptcy proceedings. The

Bankruptcy Code, however, is overwhelmingly concerned with *the debtor's* estate. Bankruptcy law and, in particular, chapter 11 bankruptcy, aims to "permit[] business debtors to reorganize and restructure their debts in order to revive the debtors' businesses" and "maximiz[e] the value of the bankruptcy estate" (*Toibb v Radloff*, 501 US 157, 163 [1991]). The accomplishment of these purposes relies upon the proper composition and allocation of the debtor's estate. Consequently, federal courts have "exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate" (28 USC § 1334 [e] [1]).

In light of these purposes of the Bankruptcy Code, a significant component of a preemption analysis in the bankruptcy context must be the degree to which the state claims interfere with the administration of the debtor's estate. Here, resolution of plaintiff's claims in state court does not risk interference with the Bankruptcy Court's control over, or disposition of, the bankruptcy estate insofar as the present suit does not impair the debtors' estates. The debtors in the bankruptcy proceedings—i.e., the borrowers—are unaffected by whether plaintiff prevails on its tort claims against defendants, and the state action has no impact on the borrowers' ability to obtain a "fresh start" (*Marrama*, 549 US at 367 [internal quotation marks and citations omitted]).

It is not disputed that valid contracts existed between plaintiff and the borrowers. Plaintiff's claims arising out of the borrowers' breach of those contracts *as asserted against the borrowers* were resolved by the bankruptcy proceeding. Here, plaintiff alleges that defendants knew of the relevant contractual terms and deliberately induced the borrowers' violations of those terms prior to the bankruptcy proceedings. In other words, plaintiff's

allegations state a claim for tortious interference with contract, and the remedy for that tort will not affect the debtor's estate. As such, these claims will not encroach upon the province of the bankruptcy court. Stated simply, plaintiff's claims "do[] not require the adjudication of rights and duties of creditors and debtors under the Bankruptcy Code" (*Davis v Yageo Corp.*, 481 F3d 661, 679 [9th Cir 2007]; *cf. In re Extended Stay Inc.*, 435 BR 139, 151-152 [SD NY 2010]).

Rather, plaintiff alleges that certain conduct engaged in by defendants—before the bankruptcy proceedings were even commenced—tortiously interfered with its contractual rights under various loan agreements. Litigation of those claims will require resolution of whether: plaintiff had a valid contract with the borrowers; defendants had knowledge of that contract and its relevant terms; defendants intentionally and improperly induced a breach of that contract; and plaintiff sustained damages caused by that conduct (*see Oddo Asset Mgt. v Barclays Bank PLC*, 19 NY3d 584, 594 [2012]; *White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 8 NY3d 422, 426 [2007]). Contrary to the dissent's assertion, our state courts will not be asked to determine whether the borrowers' bankruptcy petitions were filed in bad faith or whether defendants engaged in some wrongful conduct during the bankruptcy proceedings themselves. Regardless of whether the *borrowers* filed for bankruptcy in good or bad faith (*see generally* 11 USC § 362 [d] [1]), "plaintiff may recover damages for tortious interference with contractual relations even if defendant[s] . . . w[ere] engaged in lawful behavior" to the extent that their conduct, as non-debtors, is not alleged to have been in violation of the Bankruptcy Code (*NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614, 621 [1996]). As defendants may be found to have

tortiously interfered with plaintiff's contractual rights prior to the bankruptcy proceedings without any inquiry by the state court into whether any provision of the Bankruptcy Code was violated, those cases relied on by defendants and the dissent addressing preemption of bad-faith filing or abuse of process claims as between debtors and creditors are inapposite.

Defendants and the dissent point to *Choy v Redland Ins. Co.* (103 Cal App 4th 789, 796, 127 Cal Rptr 2d 94 [Cal Ct App 2002]) and *Astor Holdings, Inc. v Roski* (325 F Supp 2d 251, 263 [SD NY 2003]) as compelling support for the conclusion that preemption is applicable here. Reliance on these cases is unpersuasive. In *Choy*, a California court concluded that the plaintiff's claim was preempted where plaintiff alleged that the defendants "induced" a debtor to "file a bankruptcy petition" in "order to benefit themselves" (103 Cal App 4th at 801, 127 Cal Rptr 2d at 102). Likewise, *Astor* "involved allegations that the defendant induced a third party to file for bankruptcy, harming the plaintiff" (325 F Supp 2d at 262). Unlike in *Choy* and *Astor*, where the filing of the bankruptcy petitions themselves was "the basis" of the plaintiffs' claims (*id.*), plaintiff here does not allege that defendants induced the borrowers' bankruptcy petition but, rather, that they induced breaches of independent contractual provisions prohibiting asset and interest transfers and certain types of indebtedness.[8]

Federal caselaw addressing bankruptcy preemption of state-law tort claims against third parties differentiates between those claims that are based on conduct that occurs

---

[8] Indeed, the District Court permitted certain of the plaintiff's claims in *Astor* to proceed, including a claim that the defendant had tortiously interfered with a bankruptcy settlement agreement between the plaintiff and a debtor (*see Astor Holdings, Inc. v Roski*, 325 F Supp 2d 251, 270 [SD NY 2003]).

during bankruptcy, and conduct undertaken by a third party before commencement of a bankruptcy proceeding. Contrary to the dissent's view, those cases neither find preemption merely because some fact questions might overlap with bankruptcy proceedings, nor base preemption on whether the damages resulting from a state-law tort or contract action would be calculated by the delay caused by the bankruptcy proceedings.

As the dissent observes, the Ninth Circuit Court of Appeals has held that federal law preempts state courts from determining a creditor's claim against a debtor asserting that the filing of a bankruptcy petition was an abuse of process (*see Gonzales v Parks*, 830 F2d 1033, 1035 [9th Cir 1987]) and a debtor's allegation that a creditor's assertion of a claim in a bankruptcy proceeding constituted malicious prosecution (*see MSR Expl., Ltd. v Meridian Oil, Inc.*, 74 F3d 910, 911 [9th Cir 1996]; *see also In re Miles*, 430 F3d 1083, 1086 [9th Cir 2005] [holding that federal law preempted state claims alleging that "various (involuntary) bankruptcy filings and/or prosecution of them caused great emotional, physical, mental and psychological suffering and distress"]). However, the Ninth Circuit's holding in *Davis v Yageo Corp.* (481 F3d 661, 679 [9th Cir 2007]) undercuts the dissent's view that these cases support the proposition that any tort claims alleging that the damages incurred are causally connected to a bankruptcy proceeding are preempted.

In *Davis*, the complaint of minority shareholders alleged "that the directors and majority shareholder engaged in self-dealing to the detriment of the corporation through their decision to pursue bankruptcy and sought damages for breach of fiduciary duty under California state law" (*id.* at 679). The defendants argued that the plaintiffs' state law causes of action were preempted because they essentially constituted claims that defendants had

"improperly used the bankruptcy process" (*id.* at 678). The Ninth Circuit clarified that its prior cases, including *Gonzales v Parks* (830 F2d 1033), *MSR Expl., Ltd. v Meridian Oil, Inc.* (74 F3d 910) and *In re Miles* (430 F3d 1083), "hold only that state law causes of action for abuse of process and malicious prosecution involving conduct that occurred *during* bankruptcy are preempted" (*Davis*, 481 F3d at 678). The Court explained that, by contrast, the plaintiffs' claims in *Davis* were not preempted because they "concern[ed] conduct that occurred prior to bankruptcy" and did "not require the adjudication of rights and duties of creditors and debtors under the Bankruptcy Code" (*id.* at 678, 679). The same is true here. Furthermore, the Ninth Circuit declined to hold the claims preempted despite the fact that the plaintiffs' damages could be traced to the bankruptcy proceeding, as the measure of the damages alleged was the difference in the value of the company's shares before and after the defendants' decision to file for bankruptcy (*see id.* at 674). Thus, the *Davis* court recognized that it is the nature of the legal claim, not the measure of damages, that is relevant to determining whether a state law claim is preempted.

As the dissent observes, plaintiff could have pursued a request for dismissal of the bankruptcy proceedings or relief from the automatic stay. However, the Bankruptcy Court's determination of any such request, while potentially reducing the amount of plaintiff's ultimate damages, would not have resolved the question of whether defendants' conduct was tortious and, as already noted, defendants do not claim that any remedy was available to plaintiff in the bankruptcy proceedings to compensate plaintiff for *defendants'* alleged wrongdoing. Thus, this is not a situation where state and federal law provide "two separate remedies" for identical grievances, thereby leading to an inevitable conflict

(*compare Garner v Teamsters*, 346 US 485, 499 [1953] [state remedy of granting injunction against picketing conflicted with federal law where federal law authorized National Labor Relations Board to issue cease and desist order or injunction if picketing violated federal labor law]).

In addition, viewing the Bankruptcy Code as a whole to discern the relevant congressional intent, it is noteworthy that the Code expressly authorizes the court to award judgment for monetary damages "proximately caused by" a bad-faith petition or punitive damages for a bad-faith petition only in the context of involuntary bankruptcy petitions (11 USC § 303 [i] [2]). No comparable statutory authorization for compensatory monetary damages exists in voluntary proceedings, weakening defendants' argument in support of federal preemption here (*see In re Repository Tech., Inc.*, 601 F3d 710, 724 [7th Cir 2010]). In lieu of an express federal remedy authorizing monetary damages for bad-faith voluntary bankruptcy petitions—such as the one that exists for involuntary petitions filed in bad faith—the dissent offers several alternatives, none of which would permit recovery of the tort damages sought here and none of which address wrongs committed by a non-debtor third party. Dismissal of the bankruptcy petition (*see generally* 11 USC § 1112 [b]) or lifting of the automatic stay (*see* 11 USC § 362 [d] [1])—the remedies relied on by defendants and the dissent to support preemption—merely operate to prevent future damages from accumulating; such remedies do not compensate for past injuries. Similarly, the sanctions available under the Federal Rules of Bankruptcy Procedure do not, and are not intended to, compensate an injured third party (*see* Federal Rules of Bankruptcy Procedure, Rule 9011 [c]). The existence of these remedies, then, is insufficient evidence

of Congress's preemptive intent with respect to actions such as the instant one, inasmuch as none of the remedies extend to the pre-filing conduct of third-party tortfeasors (*cf. In re Repository Tech., Inc.*, 601 F3d at 724 [drawing distinction between voluntary and involuntary bad-faith filings in complete preemption analysis based on the lack of a damages remedy in voluntary petition cases]).  Under these circumstances, any obstacle presented by plaintiff's tort claims, to the extent it exists, is simply too tenuous to trigger preemption.

A different conclusion is not necessitated by defendants' argument that, when the alleged tortious conduct consists of a scheme to hinder a creditor's ability to obtain expeditious resolution of a bankruptcy proceeding, permitting plaintiffs to assert tortious interference claims in state court against non-debtors may generate some tension between the state court action and the bankruptcy proceeding insofar as the alleged damages may flow from the delay occasioned by the latter.  "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power" (*Madeira v Affordable Hous. Found., Inc.*, 469 F3d 219, 241 [2d Cir 2006]; *see Silkwood*, 464 US at 256; *see also Davis*, 481 F3d at 679).

Defendants and various amici speculate that permitting plaintiff's state law claims to proceed will open the floodgates of litigation against attorneys who facilitate bankruptcy filings or provide other legal advice to debtors, debt counseling agencies, restructuring firms, and lenders to distressed borrowers.  We are confident that these concerns are overstated and, in any event, more appropriately addressed through the proper application

of our tort law.  In that regard, while we do not opine on the merits of plaintiff's tortious

interference claims here, we note that New York courts have been skeptical of the viability

of claims that attorneys, acting as agents of their clients, may be liable for tortious

interference based on the provision of legal advice (*see e.g. Little Rest Twelve, Inc. v Zajic*,

137 AD3d 540, 541 [1st Dept 2016]; *Burger v Brookhaven Med. Arts Bldg.*, 131 AD2d

622, 623 [2d Dept 1987]; *Kartiganer Assoc. v Town of New Windsor*, 108 AD2d 898, 899

[2d Dept 1985], *lv dismissed* 65 NY2d 925 [1985]; *Goldner v Sullivan, Gough, Skipworth,

Summers & Smith*, 105 AD2d 1149, 1150 [4th Dept 1984]).  Liability against debt

counseling organizations on such a theory likewise seems speculative; many potential

bankruptcy petitioners are financially bereft and close to breaching contracts with creditors,

if not already in breach, due to their inability to satisfy their financial obligations.  Plaintiffs

alleging tortious interference may have difficulty establishing the elements of the claim,

such as causation or improper inducement on the part of such agencies.  Finally, we are not

persuaded that any remaining risk of liability assumed by lenders who intentionally and

improperly induce breaches of known contractual obligations by an entity that

subsequently files for bankruptcy sufficiently "frustrate[s] 'a significant objective'" of the

Bankruptcy Code so as to compel preemption (*Doomes*, 17 NY3d at 603, quoting

*Williamson v Mazda Motor of America, Inc.*, 562 US 323, 330 [2011]).[9]

---

[9]  The dissent notes that plaintiff has repurchased the property and received a judgment against the loan guarantors for at least part of the funds loaned to borrowers (dissenting op at 32).  Needless to say, the fact that this plaintiff may have secured legal entitlement to recover from other parties a portion of its alleged damages resulting from defendants' conduct is irrelevant to the preemption question before us.

In sum, defendants have failed to meet their heavy burden of establishing that federal bankruptcy law preempts plaintiff's tortious interference claims that are based on pre-petition conduct and asserted against non-debtor defendants. Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to the Appellate Division for consideration of issues raised but not determined on the appeal to that Court.

RIVERA, J. (dissenting):

Plaintiff seeks to recover for damages allegedly caused by bankruptcies that it accuses defendants of facilitating solely to prevent recovery of collateral owed to plaintiff by one of the bankruptcy debtors. Plaintiff chose to forgo the array of federal remedies

- 1 -

available to a creditor, like plaintiff, for such alleged misuse of the bankruptcy system. Plaintiff could have sought dismissal of the bankruptcy proceedings, relief from the automatic stay preventing plaintiff's recovery of the collateral, foreclosure on the property, or sanctions against the debtors for their improper conduct. Instead, plaintiff took a different course and allowed the bankruptcy claims to proceed, causing the alleged damages to accrue, only to file this separate action in state court against defendants for tortious interference with contract to recover the same damages. But "no *authorized proceeding* in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any defendant" (*Astor Holdings, Inc. v Roski*, 325 F Supp 2d 251, 262 [SD NY 2003] [emphasis in original] [citation omitted]). Therefore, the Appellate Division properly dismissed the state tort action. To put it bluntly, federal law preempts plaintiff's workaround of the bankruptcy system.

I.

A. The Loans and the Bankruptcy Action

Joseph Beninati aspired to develop a towering, waterfront apartment building in midtown Manhattan in the historic enclave of Sutton Place on the East River (the project). The project involved several entwined business entities. Beninati owned a membership interest in BH Sutton Owner LLC (Sutton Owner), which owned a 100% membership interest in BH Sutton Mezz LLC (Mezz Borrower). Sutton 58 Owner LLC (Mortgage Borrower) was a wholly owned subsidiary of Mezz Borrower and owner of the real property where the project was to be constructed.

Plaintiff, Sutton 58 Associates LLC, loaned to Mezz Borrower and Mortgage Borrower (collectively, borrowers) an aggregate principal loan of $147,250,000 to finance construction of the building. The loans were documented in a mezzanine loan structure consisting of various loan agreements with provisions commonly used in the real estate development industry. As relevant to this appeal, borrowers covenanted to at all times remain "Special Purpose Bankruptcy Remote Entities" unencumbered by additional indebtedness and to refrain from owning any assets other than the project.[1] Together, these covenants limited borrowers to developing the project.

The loans matured, and borrowers defaulted. Plaintiff issued notices of default and sought to recover its agreed upon collateral by notice of a UCC auction sale of Mezz Borrower's membership interest in Mortgage Borrower. Borrowers sought to enjoin the sale in state court, alleging, among other things, that plaintiff's attempt to foreclose on the collateral without complying with the statutory procedures for foreclosing on a mortgage loan resulted in an "improper clogging of [Mortgage Borrower]'s [unwaivable] equity of redemption in real property." Finding that borrowers failed to establish irreparable harm,

---

[1] A Special Purpose Bankruptcy Remote Entity, in accordance with the loan documents, is a corporation, limited partnership or limited liability company that, among other characteristics, is organized solely for the purpose of owning the project asset, and refrains from engaging in any business unrelated to ownership of the project or holding any additional assets other than the project. In comparison, the Bankruptcy Code defines "single asset real estate" as real property "constituting a single property or project, . . . which generates substantially all of the gross income of a debtor . . . and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto" (11 USC § 101 [51B]).

likeliness to succeed on the merits, or that the equities tipped in their favor, Supreme Court denied borrower's motion to enjoin the UCC sale and ordered that the sale go forward.

Three days before the scheduled UCC sale, Mezz Borrower filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Mezz Borrower attached an affidavit affirming that its filing was precipitated by plaintiff's attempt to foreclose on Mezz Borrower's membership interest in Mortgage Borrower, in which Mezz Borrower held "substantial equity."

Two weeks later, plaintiff moved the Bankruptcy Court to dismiss Mezz Borrower's petition under 11 USC § 1112 (b), or, in the alternative, to modify the automatic stay under 11 USC § 362 (d) (1). Plaintiff argued that Mezz Borrower was a "special purpose, bankruptcy remote, holding company" and the petition was "a classic bad-faith filing" only pursued by Mezz Borrower after Supreme Court "rejected [Mezz Borrower's] last ditch attempt to stave off a fully noticed UCC foreclosure." Plaintiff further characterized the petition as a "litigation tactic without the intention or serious hope of reorganizing" through bankruptcy.

In Mezz Borrower's opposition to plaintiff's motion to dismiss, Mezz Borrower painted a different picture. "Contrary to the position advanced by [plaintiff], this case is not a simple two[-]party dispute with creditors. Rather, it is a complex commercial transaction involving insatiable greed and disturbing facts." Mezz Borrower explained that it was not a "shell entity" but owned 100% of the membership interest in Mortgage Borrower as well as contracts to purchase air rights and assets that constituted the project, which had been appraised at a value of $181,000,000, "an amount well in excess of any

purported amounts claimed by [plaintiff] and all unsecured debt." In short, Mezz Borrower alleged that "review of the loan documents, exorbitant fees, transaction costs and reserves illustrate[d] a strange and unconscionable transaction," brokered by a lender who "sat at both sides of the negotiating table."

Prior to the hearing on the motion, Mortgage Borrower filed for reorganization under Chapter 11, and Mezz Borrower subsequently filed for joint administration of borrowers' bankruptcy petitions. Borrowers represented to the Bankruptcy Court that their bankruptcy filings "prevented their unscrupulous lenders from engaging in illegal activity through a 'back door play' against [borrowers]."[2] Following plaintiff's withdrawal of its motion, the court consolidated the two bankruptcies for joint administration. Within a few months, plaintiff and a creditors' committee jointly filed a reorganization plan that was accepted and confirmed by the Bankruptcy Court.

---

[2] Borrowers, seeking to subordinate and reduce the amount they owed defendants on the subject loans, commenced another action, an adversarial proceeding in bankruptcy court, alleging improper conduct by plaintiff and several nonparty entities (adversarial defendants), through their principals. Borrowers alleged breach of contract, breach of implied duty of good faith and fair dealing, contractual unconscionability, fraud, deceit, estoppel, equitable subordination, objection to claim, criminal usury, unjust enrichment and lender liability by the adversarial defendants. Borrowers also sought declaratory relief to determine the nature, extent, and validity of the defendants' liens against the project.

After a bench trial, the court found that borrowers failed to establish a basis for liability on all claims except the alleged criminal usury because one of the loans at issue carried a rate in excess of New York's criminal usury statute. The adversarial defendants agreed to waive their claim for interest on the building loan, which reduced plaintiff's secured claim under the loan agreements. The court further ordered that the adversarial defendants, including plaintiff here, were entitled to a credit bid of all or such portion of its allowed secured claims with respect to the sale of borrowers' assets.

B.

Plaintiff's Tortious Interference Claims

During the pendency of the bankruptcies, plaintiff brought this action for tortious interference with contract against Prime Alliance Group, Ltd., and Sutton Opportunity LLC, and their three individual owners and managers, Philip Pilevsky and his sons Michael and Seth, in state court. Plaintiff alleged that the borrowers' bankruptcies, which defendants facilitated through their tortious conduct, stayed the foreclosure proceeding, causing plaintiff to incur damages and attorney's fees.[3] Borrowers' bankruptcies predominate plaintiff's narrative of the many vicissitudes of the underlying commercial transaction and the various litigations arising therefrom, including this appeal. Indeed, "bankruptcy" is mentioned 56 times in 41 of the 125 paragraphs of the complaint.

According to plaintiff, defendants were instrumental in a two-part scheme to prevent it from recovering its collateral for the loan maturity defaults.

> "Defendants, who were strangers to the Project, intentionally and improperly caused these contractual breaches in a scheme to benefit themselves and obtain an ownership interest in the Project []. The [] Scheme had two parts.
>
> "First, when plaintiff tried to exercise its agreed-upon contractual remedies following the maturity defaults, Philip Pilevsky caused Prime Alliance to lend Mezz Borrower $50,000 (the 'Pilevsky Loan') to retain a law firm (in which

---

[3] The majority is only partially correct that plaintiff sought damages "because the bankruptcy proceeding was more protracted due to the borrowers no longer qualifying as single asset real estate entities" (majority op at 5). Plaintiff also sought damages incurred as a result of defendants' facilitation of the bankruptcy (by loaning funds to Mezz Borrower to commence its bankruptcy petition), which, in turn, triggered an automatic stay of the foreclosure sale. In other words, according to plaintiff, defendants caused an injury in tort, in the first instance, merely by the fact of Mezz Borrower filing its bankruptcy petition.

another Pilevsky is a partner) to file a petition for bankruptcy and prevented plaintiff from exercising those remedies. This caused Mezz Borrower to breach no fewer than five contractual obligations to plaintiff[:] . . . (a) not to file a petition for bankruptcy; (b) not to incur debt other than 'Permitted Indebtedness'; (c) to pay its liabilities out of its own funds and assets; (d) to consider the interest of plaintiff in connection with all of its corporate actions; and (e) to remain a special purpose bankruptcy remote entity.

"Second, Michael Pilevsky and Seth Pilevsky caused Sutton Opportunity to transfer three rental apartments . . . (the 'Pilevsky Apartments') to Mortgage Borrower to evade a fundamental protection in favor of plaintiff under bankruptcy law. . . . The Pilevsky Apartment transaction caused Mortgage Borrower to breach no fewer than seven contractual obligations to plaintiff[:] . . . (a) not to file a petition for bankruptcy; (b) not to own any real property or assets other than the Project property; (c) not to engage in any business unrelated to the Project; (d) not to make or permit the sale or transfer any indirect interest in Mortgage Borrower; (e) to pay its liabilities out of its own funds and assets; (f) to consider the interests of plaintiff in connection with all corporate actions; and (g) to remain a special purpose bankruptcy remote entity."

Plaintiff further claimed that defendants knowingly and willfully precipitated borrowers' misuse of the bankruptcy system.

"Philip Pilevsky has sworn under penalty of perjury that he caused Prime Alliance to make the Pilevsky Loan 'so that [Mezz Borrower] could file for reorganization under Chapter 11 of the Bankruptcy Code.' . . . The Pilevsky Loan was made, and Mezz Borrower's bankruptcy petition was filed, just after this Court issued an order allowing plaintiff to foreclose and on the eve of that foreclosure. Mezz Borrower's managing member has sworn that Mezz Borrower filed for bankruptcy in order to avoid that foreclosure, which is a breach of Mezz Borrower's contract with plaintiff.

"The Pilevsky Apartments transaction was similarly willful and improper. The defendants urgently sought to get the Pilevsky Apartments into the hands of Mortgage Borrower,

which immediately upon receipt of the Pilevsky Apartments filed a bankruptcy petition stating that it was subject to the Bankruptcy Code's restrictions on bankruptcy filings by 'single Asset Real Estate' businesses. Mortgage Borrower's managing member has sworn under oath that the transaction was intended 'to bring in equity' and unrelated real estate, which are breaches of Mortgage Borrower's contract with plaintiff."

According to plaintiff, the sole purpose of these machinations was to prevent plaintiff from swiftly recovering its collateral.

Plaintiff also alleged that the scheme allowed Mortgage Borrower to end its status as a single asset real estate entity in order to "dodge" the applicable Bankruptcy Code provisions.

"The Bankruptcy Code, for good reason, disfavors a Single Asset Real Estate entity using bankruptcy to defeat the ordinary contractual remedies of its secured lender (here, plaintiff). Michael Pilevsky and Seth Pilevsky caused Sutton Opportunity to transfer the Pilevsky Apartments to Mortgage Borrower in order to allow it to seek to dodge these Bankruptcy Code provisions and to continue to avoid the consequences of its maturity defaults. . . ."

To summarize the manipulative purpose of the bankruptcy filings, plaintiff explained that,

"The Bankruptcy Code reflects a specific public policy that protects lenders to single asset real estate projects from 'eve of foreclosure' bankruptcy filings that delay lenders' rights to exercise their remedies. The Project at issue here is exactly the type of property covered by these statutory protections. The Pilevsky Apartments were transferred to Mortgage Borrower so that it could represent that it was not a Single Asset Real Estate business.

"If Mortgage Borrower were engaged in a Single Asset Real Estate business, 11 USC § 362 (d) (3) would allow plaintiff

relief from the automatic stay to proceed with its foreclosure unless, within 90 days, the debtor starts servicing the mortgage debt or the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time.

"If Mortgage Borrower were engaged in a Single Asset Real Estate business, 11 USC § 362 (d) (3) (B) (ii) would allow plaintiff to be relieved from the Bankruptcy Code's automatic stay and to proceed with its maturity default remedies against Mortgage Borrower if Mortgage Borrower did not pay monthly interest payments to plaintiff within ninety days of the petition date."

Critically, plaintiff alleged that defendants' prebankruptcy conduct adversely affected plaintiff's rights as a creditor in the bankruptcy proceedings.

"Section 362 (d) (3) (B) (ii) would apply here. On the date it filed for bankruptcy, Mortgage Borrower had no liquid assets, no income-generating assets, no employees, and no ability to make such monthly interest payments to plaintiff.

"Furthermore, if Mortgage Borrower were engaged in a Single Asset Real Estate business, 111 USC § 362 (d) (3) (B) (i) would allow plaintiff to be relieved from the Bankruptcy Code's automatic stay and to proceed with its maturity default remedies against Mortgage Owner if Mortgage Borrower did not file, within ninety days of the petition date, a plan of reorganization that has a reasonable possibility of being confirmed within reasonable time. A Chapter 11 debtor that is not engaged in a Single Asset Real Estate business does not need to satisfy this requirement in order to benefit from the Bankruptcy Code's automatic stay.

"Section 362 (d) (3) (B) (i) would apply here. Mortgage Borrower was not able to file a plan for reorganization within ninety days of its April 6, 2016 petition date. The plan for reorganization Mortgage Borrower ultimately filed outside that time period does not have a reasonable possibility of being confirmed within a reasonable time. It calls for months of discovery and litigation before the bankruptcy court will even rule on it. And it requests the Property to be sold at a public

> sale after the conclusion of that litigation, even though Mortgage Borrower has a single secured creditor, plaintiff, and unsecured obligations that are dwarfed in size by plaintiff's secured claim."

These excerpts of the complaint amply demonstrate that plaintiff's tort claims arise from, and seek damages caused solely by, the bankruptcy filings. Without the bankruptcy filings there would have been no automatic stay, which means no delay, and no damages. Plaintiff can prevail on its state claims only if it establishes that defendants caused these damages from debtors' alleged bad-faith filings and misuse of the bankruptcy system.

Defendants moved for summary judgment on preemption grounds. The court denied the motion, concluding that borrowers' breaches of the loan agreements had nothing to do with bankruptcy, and it would not have to rule on the question of bad-faith filings, which was not addressed by the bankruptcy court. The Appellate Division reversed and granted defendants summary judgment as "plaintiff's damages [arose] only because of the bankruptcy filings" and are thus preempted (168 AD3d 477 [1st Dept 2019]).

Plaintiff has recast as state law causes of action what are in fact complaints of bad-faith filings and misuse of the bankruptcy system. Litigation of these claims in state court frustrates the congressional purpose of the Bankruptcy Code's remedial provisions. It allows plaintiff to forego its federal remedies to avoid the damages it now claims to have incurred, even as it participates in the bankruptcies and recovers its collateral, and while it simultaneously requests that a state court declare it has been damaged by the improper actions taken in those same proceedings. The Appellate Division got it right; these claims are preempted.

## II.

## A.

## Federal Bankruptcy Law Preemption of State Claims

The Supremacy Clause of the United States Constitution commands that federal law is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const, art VI, cl 2). In accordance with the Clause's preemption mandate, courts "must not give effect to state laws that conflict with federal laws" (*Armstrong v Exceptional Child Ctr., Inc.*, 575 US 320, 324 [2015], citing *Gibbons v Ogden*, 22 US [9 Wheat] 1, 210 [1824]; *accord Cipollone v Liggett Grp., Inc.*, 505 US 504, 516 [1992] ["(S)ince our decision in *M'Culloch v Maryland*, 17 US (4 Wheat) 316, 427 (1819), it has been settled that state law that conflicts with federal law is 'without effect'"]; *Murphy v National Collegiate Athletic Assn.*, — US —, 138 S Ct 1461, 1476 [2018] ["(W)hen federal and state law conflict, federal law prevails and state law is preempted"]). The Supremacy Clause "is essentially a power conferring provision, one that allocates authority between the national and state governments" (*Western Air Lines, Inc. v Port Auth. of New York & New Jersey*, 817 F2d 222, 225 [2d Cir 1987] [citation omitted]).

Whether state regulation of a particular subject matter "is invalid under the Supremacy Clause depends on the intent of Congress" (*Malone v White Motor Corp.*, 435 US 497, 504 [1978] [citation omitted]; *see also City of New York v ExxonMobil Corp. [In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.]*, 739 F Supp 2d 576, 602 [SD NY 2010] ["(T)he touchstone of the doctrine of federal preemption is not fairness to

the parties; it is Congressional intent"). "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment" (*Lorillard Tobacco Co. v Reilly*, 533 US 525, 541 [2001]; *see also Balbuena v IDR Realty LLC*, 6 NY3d 338, 356 [2006] ["The Supremacy Clause, in article VI of the Constitution, may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law"] [citation an internal quotation marks omitted]).

I agree with defendants that litigation of the state claims conflicts with bankruptcy law.[4] A conflict exists "where compliance with both federal and state regulations is a physical impossibility[,] or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Balbuena*, 6 NY3d at 356, quoting *Ray v Atlantic Richfield Co.*, 435 US 151, 158 [1978]). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects" (*Crosby v National Foreign Trade Council*, 530 US 363, 373 [2000]). Critical to the analysis in this appeal, "when two

---

[4] Because I conclude that conflict preemption applies here, I have no occasion to opine on defendants' field preemption argument. To the extent that the majority suggests that defendants are subject to a heavier burden to show preemption because state common law remedies are at issue (*see* majority op at 23 ["defendants have failed to meet their heavy burden of establishing that federal bankruptcy law preempts plaintiff's tortious interference claims that are based on pre-petition conduct and asserted against non-debtor defendants"]), I need not reach the issue. The question is whether Congress intended for the Code's remedial scheme to preempt plaintiff's claims given the *nature* of the claims, not the theory of liability in which they sound.

separate remedies are brought to bear on the same activity, a conflict is imminent" (*Garner v Teamsters, Chauffeurs & Helpers Local Union No. 776 [A. F. L.]*, 346 US 485, 498-499 [1953]).

Under its federal constitutional power to establish "uniform Laws on the subject of Bankruptcies through the United States," Congress enacted the Bankruptcy Code (US Const, art I, § 8, cl 4; *accord Kunzler v Kohaus*, 5 Hill 317, 324 [1842] ["The subject in respect to which uniform laws are authorized, is bankruptcy throughout the United States (and) the power conferred is without restriction, save in its uniformity"]). The Bankruptcy Code "provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights" (*Eastern Equip. & Servs. Corp. v Factory Point Nat. Bank, Bennington*, 236 F3d 117, 120 [2d Cir 2001], citing 11 USC § 101 *et seq.*). The Code provides a detailed procedure "by which [an] . . . insolvent debtor[] can reorder their affairs" and "make peace with their creditors" (*Grogan v Garner*, 498 US 279, 286 [1991] [citation omitted]). It accomplishes this by enabling the continued operation of the subject estate through restructuring (*N.L.R.B. v Bildisco & Bildisco*, 465 US 513, 550 [1984]) and the "equitable distribution of the bankrupt's estate" (*United States v Embassy Rest., Inc.*, 359 US 29, 31 [1959]). A good faith standard applies to bankruptcy petitions, which "furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy" (*In re C-TC 9th Ave. Partnership*, 113 F3d 1304, 1310 [2d Cir 1997], quoting *Little Creek Dev. Co. v*

*Commonwealth Mortgage Corp. [In re Little Creek Dev. Co.]*, 779 F2d 1068, 1071 [5th Cir 1986]).

To ensure the proper functioning of the bankruptcy system, Congress has provided remedies to prevent bad-faith filings and actions intended to misuse the bankruptcy process. "[S]uch misuse is governed exclusively by [the Bankruptcy] Code" (*Astor Holdings*, 325 F Supp 2d at 262). These remedies include, among other things, granting relief from the automatic stay upon a showing that a petition is part of "a scheme to delay, hinder, or defraud creditors that involved either [] transfer of all or part ownership of, or other interest in, [single asset real estate] without the consent of the secured creditor or court approval" (11 USC § 362 [d] [1]). A creditor may also seek to have the bankruptcy proceeding dismissed or have the proceeding converted to a proceeding under chapter 7 of the Bankruptcy Code (11 USC § 1112 [b]).[5] Under Rule 9011 of the Federal Rules of

---

[5] The Second Circuit Court of Appeals has recognized the following non-exhaustive list of indicia of bad-faith conduct:

> "(1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees" (In re MBM Entertainment, LLC, 531 BR 363, 408 [Bankr SD NY 2015], quoting *In re C-*

Bankruptcy Procedure, the court may impose sanctions against parties, attorneys or law firms that have filed a petition "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" (Fed R Bankr P 9011 [b] [1]; *see also Midland Funding, LLC v Johnson*, ___US___, 137 S Ct 1407, 1419 n 5 [2017, Sotomayor, J., dissenting] [noting that Rule 9011 of the Federal Rules of Bankruptcy Procedure "authorize[s] a court to impose sanctions on parties who willfully file meritless claims"). Chapter 11 bankruptcy aims to "permit[] business debtors to reorganize and restructure their debts in order to revive the debtors' businesses" and "maximiz[e] the value of the bankruptcy estate" (*Toibb v Radloff*, 501 US 157, 163 [1991]), but the Bankruptcy Code's remedial framework evinces Congress' clear and manifest interest to protect the proper "adjudication of the rights and duties of *creditors*" under the Code (*Davis v Yageo Corp.*, 481 F3d 661, 679 [9th Cir 2007] [emphasis added]).

The majority of courts to address the issue have concluded that state regulations, including tort actions, that conflict with this carefully designed federal statutory framework or obstructs its purpose are preempted (*see e.g. Metcalf v Fitzgerald*, 214 A3d 361, 379 [Conn 2019]; *PNH, Inc. v Alfa Laval Flow, Inc.*, 958 NE2d 120, 126 [2011]; *Stone Crushed Partnership v Kassab Archbold Jackson & O'Brien*, 908 A2d 875, 886 [2006]; *Glannon v Garrett & Assocs., Inc.*, 261 BR 259, 265 [D Kan 2001]; *Pertuso v Ford Motor Credit Co.*, 233 F3d 417, 426 [6th Cir 2000]; *Koffman v Osteoimplant Tech., Inc.*, 182 BR 115, 127 [D Md 1995]).

_____

*TC 9th Ave. Partnership*, 113 F3d at 1311; *see also* 9A Am Jur 2d Bankruptcy § 911).

The Second Circuit has explained that,

> "(1) Congress placed bankruptcy jurisdiction exclusively in the district courts under 28 U.S.C. § 1334 (a); (2) Congress created a lengthy, complex and detailed Bankruptcy Code to achieve uniformity; (3) the Constitution grants Congress exclusive power over the bankruptcy law; (4) the Bankruptcy Code establishes several remedies designed to preclude the misuse of the bankruptcy process; and (5) the mere threat of state tort actions could prevent individuals from exercising their rights in bankruptcy, thereby disrupting the bankruptcy process (*Eastern Equip.*, 236 F3d at 121 [internal citation omitted], citing *MSR Expl., Ltd. v Meridian Oil, Inc.*, 74 F3d 910, 913-916 [9th Cir 1996]).

Remedies for bad-faith-filings and misuse of bankruptcy are well-covered terrain under the Code. Accordingly, the propriety of a bankruptcy filing is solely within the jurisdiction of the bankruptcy court because "no *authorized proceeding* in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any defendant" (*Astor Holdings*, 325 F Supp 2d at 262, quoting *Choy v Redland Ins. Co.*, 103 Cal App 4th 789, 800, 127 Cal Rptr 2d 94, 102 [Cal Ct App 2002] [emphasis in original]).

## B.

### Elements of Common Law Tortious Interference with Contract

The substantive law of tortious interference with contract is also central to the analysis in this appeal. The common law elements of tortious interference with contract are "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting

therefrom" (*Lama Holding Co. v Smith Barney*, 88 NY2d 413, 424 [1996]; *see also Oddo Asset Mgt. v Barclays Bank PLC*, 19 NY3d 584, 594 [2012]). Damages are an essential element of the tort (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993]). Another keystone is the requirement that the conduct is "without justification," which "draw[s] its substance from the circumstances of the particular situation at hand" (*Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 NY2d 183, 190 [1980]).

Our Court has observed that,

> "(t)he issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation" (*id.*, quoting Restatement [Second] of Torts § 767, Comment *b*; *accord NBT Bancorp v Fleet/Norstar Fin. Grp.*, 87 NY2d 614, 621 [1996] ["(T)he degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights"]).

Factors to be considered by the court are (a) "the nature of the conduct of the [party] who interferes (a chief factor in determining whether conduct is improper)" and that party's motive, (b) the interests sought to be advanced by the interfering party, (c) the broader social interests in protecting the "freedom of action" for the interfering party and the contractual interests of the party being interfered with, and (d) proximity to the interference of the conduct complained of (*Guard-Life Corp.*, 56 NY2d at 190). The interests of the

party with whom the actor's conduct interferes, and the relationship between the parties are also relevant factors (*id.*).[6]

## III.

As noted, plaintiff's state common law claims are for damages incurred due to the delay caused by the bankruptcy proceeding, occasioned by the filing, which triggered the automatic stay, as well as the change in the Mortgage Borrower's status from a special purpose bankruptcy remote entity to a holder of multiple assets. Plaintiff seeks compensatory damages, which, assuming plaintiff prevails, would require the court to calculate the loss flowing from the automatic stay and any additional delay caused by the status change. The court must also determine whether defendants *improperly* induced debtors to breach their contractual obligations, which would require the court to opine on the legitimacy of the debtors' bankruptcy proceedings and defendants' interest and role in facilitating debtors' filings. The court must also inquire into the causal relationship between plaintiff's damages and defendants' alleged tortious conduct, which turns in large part on the propriety of borrowers' bankruptcy proceedings.

The majority correctly expounds on the law and explains "that, where a tort claim is premised upon the bankruptcy filing, itself, or conduct that occurs within the bankruptcy proceeding and under the purview of the Bankruptcy Court, the obstacle presented by state

---

[6] I need not address whether the majority's assertion that a claim of tortious interference with contract is a historic example of our state's regulation of public health and safety (majority op at 9), because for purposes of preemption, the dispositive question remains whether Congress intended to preempt the state's regulation of the subject matter at issue.

tort remedies is more readily discerned. Parallel tort actions in state court against a debtor or creditor based on that party's alleged wrongful conduct in a bankruptcy proceeding risks subverting the Bankruptcy Court's authority to adjudicate the validity of bankruptcy filings, or otherwise producing inconsistent standards or outcomes between state and federal law" (majority op at 14). But then the majority reaches the unfounded conclusion that plaintiff's case does "not impugn[] the bankruptcy process" (*id.*). It is as if the majority read a different complaint than the one filed by plaintiff in Supreme Court wherein it alleged repeatedly that the bankruptcy was commenced for an improper purpose, at the behest and for the benefit of defendants, and that defendants' conduct was willful and improper. The only way to read these allegations is that plaintiff "cast doubt upon," "call[ed] into question," and roundly "dispute[d] the truth, validity or honesty of" the bankruptcy proceeding, which, by definition, means plaintiff impugned the bankruptcy action (impugn, New Oxford American Dictionary [3d ed 2010]; impugn, Black's Law Dictionary [11th ed 2019]; impugn, Merriam Webster's Collegiate Dictionary 585 [10th ed 1993]).

Although, as the majority argues, a plaintiff may recover damages for tortious interference with contract even if the defendant "w[as] engaged in lawful behavior" (majority op at 16, quoting *NBT Bancorp*, 87 NY2d at 621), nonetheless, under our law the allegedly tortious conduct must be "improper *under the circumstances*" (*Guard-Life Corp.*, 50 NY2d at 190 [emphasis added]). The majority ignores our observation in *Guard-Life Corp.* that whether a defendant's conduct is tortious is necessarily particularized (*id.*). Here, plaintiff alleged that borrowers and defendants acted pursuant to a scheme to

disadvantage plaintiff as creditor by filing for bankruptcy. If true, at a minimum, this constitutes improper conduct intended to achieve defendants' own ends by use of a surrogate with equally bad intentions and with the common goal to injure plaintiff.

Thus, contrary to the majority view, the state court is caused to invade the precinct of bankruptcy law to determine the merits of plaintiff's claim of tortious interference with contract. But federal courts have exclusive jurisdiction over that determination (*see Gonzales v Parks*, 830 F2d 1033, 1035 [9th Cir 1987] [stating that, allowing state courts to determine whether a claim for relief under federal law is of merit "would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating"]).

In *Choy v Redland Insurance Co.* (103 Cal App 4th 789 [Cal Ct App 2002]), the plaintiff brought a state court action against an insurance company and associated defendants. The plaintiff alleged that the defendants encouraged the insured to petition for bankruptcy for the "real purpose" of "frustrat[ing]" the plaintiff's "ability to seek and obtain a judgment against [the insured]" in excess of defendant insurer's policy limit (*id.* at 794). The claims were preempted because the "gist" of the plaintiff's complaint was the defendants' "misuse[] [of] the bankruptcy process" and state court remedies cannot serve as a vehicle to "circumvent well established federal rules relating to redress" for such misuses (*id.* at 802). Although bankruptcy law references state law, "the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal" (*id.* at 797, quoting *MSR Expl.*, 74 F3d at 914 [alteration omitted]). The "superimposition"

of tort remedies "on the many activities that might be undertaken in the management of the bankruptcy process" would lend to intolerable exposure to claims of malicious prosecution (*Choy*, 103 Cal App 4th at 798).

As recognized in *Choy*,

> "the highly complex laws needed to constitute the bankruptcy courts and regulate the rights of debtors and creditors also underscore the need to jealously guard the bankruptcy process from even slight incursions and disruptions brought about by state malicious prosecution actions. To put it another way, the problem here is not only one of state courts deciding issues of federal law in one manner or another. That is not an entirely unique situation, even when uniformity is required. The difficulty here goes much deeper. It is a question of state courts, in effect, interfering with the whole complex, reticulated bankruptcy process itself" (*id.* at 797-798 [internal citation omitted]).

As in *Choy*, if plaintiff incurred damages because of borrowers' improper bankruptcy filings, it was for the bankruptcy court to address those claims, not a state court (*id.* at 801).

Plaintiff here has made no claim—as it could not—that its only remedy for its damages lies in state court because "the 'authorized proceeding' in bankruptcy was not only exclusive, it was adequate" (*id.*; *see supra* Part II.A). Plaintiff's choice to forego the remedies in the forum available to it under the Bankruptcy Code does not open the door to our courts.

The Ninth Circuit in *Gonzales* has explained that,

> "Congress' authorization of certain sanctions for the filing of frivolous bankruptcy petitions should be read as an implicit rejection of other penalties, including the kind of substantial damage awards that might be available in state court tort suits. Even the mere possibility of being sued in tort in state court could in some instances deter persons from exercising their

rights in bankruptcy. In any event, it is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized" (*Gonzales*, 830 F2d at 1036).

In *Gonzales*, the court determined that permitting state court tort claims against a bankruptcy attorney "based on the filing of a bankruptcy petition," would distort exclusive federal jurisdiction in "much the same manner" as allowing tort damages against debtors (*id.* at 1036-1037).

Similarly, in *MSR Exploration*, the Ninth Circuit underscored the significance of the Bankruptcy Code's preemptive effect on state law remedies. The court explained that "[d]ebtors' petitions, creditors' claims, disputes over reorganization plans, disputes over discharge, and *innumerable other proceedings*"—all the business of the bankruptcy courts—would "lend themselves to claims of malicious prosecution. Those possibilities might gravely affect the already complicated processes of the bankruptcy court" (74 F3d at 914 [emphasis added]). The complaint filed by the debtors in *MSR Exploration* "self-consciously" sought damages for a claim allegedly maliciously filed and pursued during the plaintiffs' Chapter 11 bankruptcy proceeding, and the court understood that "the opportunities for asserting malicious prosecution claims," much like here, are "only limited by the fertility of the pleader's mind and by the laws of the state in which the proceeding took place" (*id.*).

Plaintiff's case here is indistinguishable in any meaningful way from *Astor Holdings*. In *Astor Holdings*, Second Circuit Judge Lynch, then a district-court judge sitting in the Southern District of New York, dismissed as preempted several tort claims that

required the court to opine on whether the defendant filed bankruptcy documents in bad faith or for an improper purpose (325 F Supp 2d at 262). The plaintiff sponsor of robotic combat events, Astor Holdings, sued defendant Roski, a robot builder, and his promotional company, alleging that these nondebtors had, among other claims, tortiously interfered with contractual agreements between plaintiff and its joint venture partner, Thorpe. The plaintiff averred that Roski had assisted Thorpe in acquiring bankruptcy counsel, and it was counsel that suggested that Thorpe file for bankruptcy. Counsel advised Thorpe that bankruptcy could serve dual purposes of "reconfigure[ing]" his debt and "freeing him of his obligations" under the contractual agreements at issue (*id.* at 257). The plaintiff's complaint alleged that filing for bankruptcy was an effort to "divest [plaintiff] of its interest in the [subject] business" (*id.* at 260).

Closer inspection of Astor Holdings' complaint demonstrates further similarities with the state claims asserted here. Astor Holdings also alleged that Roski's attorneys arranged for Thorpe to borrow $150,000 from the defendant "for the sole and express purpose of enabling Thorpe to file a bankruptcy petition. [Roski's] loan, which was secured by Thorpe's interest in the Venture, was used to pay a retainer to the bankruptcy counsel that [the defendant] picked for Thorpe." Astor Holdings contended that Roski and his attorneys, "who had formulated the strategy Thorpe and his bankruptcy counsel pursued" succeeded in "paralyzing Robot Wars and preventing the Venture from making any new deals."

Citing the Bankruptcy Code's remedies for abuse of process, the court held that "misuse of the [bankruptcy] process" is governed exclusively by the Bankruptcy Code (*id.*

at 262). Notably, relying on *Choy*, the court rejected an argument advanced by plaintiff here, and adopted by the majority, to expound that defendants' nondebtor status was "a distinction without a difference," reasoning that preemption "implies" that a claim for which the Bankruptcy Code provides a remedy "cannot be the subject of regulation by state statutory or common-law remedies" (*id.*). Further, the court explained, any assertion that Thorpe petitioned for bankruptcy or filed certain papers in bad faith or for an improper purpose would be measured by state law, and therefore would be barred (*id.* at 263). Just so here, where plaintiff alleges that borrowers' bankruptcy petitions were filed for an improper purpose: to prevent plaintiff from exercising its contractual remedies by means of the foreclosure sale.

The majority unpersuasively attempts to distinguish *Choy* and *Astor Holdings*. The courts in those cases explained that the underlying *nature* of the claims is what matters in the preemption analysis. For example, in *Choy*, "(t)he real purpose" of causing the non-party debtor to petition for bankruptcy "was to frustrate [the plaintiff's] ability to seek and obtain a judgment against [the debtor]" (103 Cal App 4th at 794). The bankruptcy filing was "on the initiative" of the defendant, who paid the necessary filing fees, so that the defendant could "avoid liability" for its bad-faith conduct in rejecting the plaintiff's earlier offers to settle an insurance dispute (*id.*). In *Astor Holdings*, Roski's attorney "suggested that Thorpe file for bankruptcy" because the Venture Agreement was purportedly "onerous," "obscene," and "unconscionable" (325 F Supp 2d at 257). The attorney also suggested to Thorpe that bankruptcy could serve the dual goal of "reconfigur[ing]"

Thorpe's debt and "freeing him of his obligations under the Venture Agreement" (*id.*).[7]

Here, plaintiff alleges breaches of contract, but its complaint is with the actions taken in bankruptcy. As I have noted (*see supra* Section I.B), for purposes of preemption, what matters is not the source of the allegedly tortious conduct but that the damages flow from the bankruptcy proceedings. Indeed, the function of the doctrine is to *preempt* a litigant's "ability collaterally to attack bankruptcy petitions in the state courts," lest a patchwork "of laws of the state in which the proceeding took place" and "the fertility of the pleader's mind" "threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution" (*Choy*, 103 Cal App 4th at 798, citing US Const, art I, § 8, cl 4).

The majority's reliance on *Davis* is no more availing. In *Davis*, the basis of the plaintiff minority shareholders' claim of breach of fiduciary duty was grounded in their allegation that defendants caused the corporation to petition for bankruptcy without "considering other alternatives that may have yielded greater value for the corporation and its shareholders" (481 F3d at 665). In other words, defendants' alleged tortious act was their failure to represent the best interests of plaintiffs by presenting bankruptcy as one option among others. Thus, "plaintiffs' breach of fiduciary duty claims [were] not based

---

[7] The majority correctly notes that in *Astor* the District Court did not dismiss the plaintiff's claim that the defendant had tortuously interfered with a bankruptcy settlement (majority op at 17 n 8) but fails to explain its relevance. The plaintiff alleged that Roski "set out to undermine the bankruptcy settlement, and Robot Wars itself, by causing Thorpe to renege on the promise to 'promote' Robot Wars" (*Astor Holdings*, 325 F Supp 2d at 269), which, unlike here, plainly does not implicate either the plaintiff's or debtor's status in the subject bankruptcy proceeding or the administration of the debtor's estate. And, of course, state courts are authorized to enforce settlement agreements.

on 'activities that might be undertaken in the management of the bankruptcy process,'" (*id.* at 679-680, quoting *MSR Expl.*, 74 F3d at 914). In contrast, the damages here flow solely from defendants' facilitation of borrowers' bankruptcies and the additional attendant delay related to administration of that process, which, according to plaintiff, would not have occurred but for defendants' alleged inducement of borrowers' contractual breaches.[8]

*Davis* illustrates that the ultimate legal conclusion turns on whether there has been *misuse* of the bankruptcy system. In *Davis*, the majority shareholders made no allegation that defendants had abused the bankruptcy system but instead argued that the defendants had a duty to weigh different options to yield the greatest value in the company's shares. In contrast, plaintiff's claim here is that defendants, acting in concert with borrowers, took advantage of "the adjustment of rights and duties within the bankruptcy process" to upset plaintiff's status as a first-tier creditor in borrowers' bankruptcy proceedings (*Choy*, 103 Cal App 4th at 797, quoting *MSR Expl.*, 74 F3d at 914).

In finding no preemption here, the majority relies on the premise that the plaintiff's claims "do not implicate debtor-creditor disputes relating to the bankruptcy estate" (majority op at 12). To the contrary, if plaintiff's claims are credited, the purpose of the bankruptcy filings was solely to delay plaintiff's recovery of its collateral**.** In fact, plaintiff

---

[8] The majority claims that my analysis compels preemption in cases where "some fact questions might overlap with bankruptcy proceedings" (majority op at 18). As I explain, the preemption analysis requires careful scrutiny of the substantive nature of the claim, and its potential disruptive impact on the bankruptcy system by, as here, avoiding the remedial framework of the Bankruptcy Code. Unlike the majority I do not ignore plaintiff's allegations and the leitmotif of its complaint that defendants and borrowers labored towards one end—filing bankruptcy to undercut plaintiff in its position as borrowers' secured creditor.

initially argued to the bankruptcy court that the filing was in bad faith. However, it withdrew its motion and instead supported the reorganization plan. In doing so, plaintiff chose to forgo its remedy for the borrowers' alleged misuse of bankruptcy law and the bankruptcy system. Plaintiff cannot now seek to have a state court decide whether the damages were caused by delay from the improper bankruptcy filings. To permit such action would interfere with and undermine the uniform remedies enacted by Congress in the Bankruptcy Code.

The majority's other argument that plaintiff's state claims are not preempted because the defendants are nondebtors and their alleged actions occurred prior to the bankruptcy, is no more persuasive. First, the preemption analysis does not turn on whether the defendants are nondebtors, but rather on the fact that the Code is written to address the impact of the alleged scheme on the bankruptcy proceeding (*see Astor Holdings*, 325 F Supp 2d at 262; *Gonzales*, 830 F2d at 1035). In other words, the issue is plaintiff's "interfer[ence] with the whole complex reticulated bankruptcy process itself" by its choice to shop forums and forego the remedial mechanisms exclusive to the bankruptcy court and gamble on a state remedy instead (*Choy*, 103 Cal App 4th at 798).

Moreover, plaintiff was a creditor in the bankruptcy proceedings when it simultaneously filed these state claims and relied on those federal proceedings to support its allegations that defendants' scheme undercut its creditor status. The majority's view that there is an insufficient connection is simply belied by the plaintiff's narrative of the interdependent actions of defendants and borrowers.

Second, the conduct alleged here was to facilitate the bankruptcies, so the fact that acts were taken prefiling is unsurprising. For example, a debtor who, before filing, secures a loan to pay the bankruptcy filing fee or acquires property to undercut a creditor's remedies—as plaintiff asserts happened here—would be relevant to the bankruptcy court's assessment of the motives of the debtor (*cf. National Hockey League v Moyes*, No. CV-10-01036-PHX-GMS, 2015 WL 7008213, at \*6 [D Ariz Nov. 12, 2015] [rejecting the plaintiff's argument that its tort claims are not preempted because the claims comprise prefiling conduct on the ground that, when an injury "might never occur, and thus plaintiff's claim would not accrue . . . until after the company files its bankruptcy petition, and accrual of the claim depends on what happens in the Bankruptcy Court, the potential future claim would interfere sufficiently with the bankruptcy process to trigger preemption"] [citation omitted]). As this example illustrates, for preemption purposes there is no analytically sound basis to distinguish between preparatory actions that make possible the bankruptcy filing. The latter cannot occur without the former—indeed that is plaintiff's core argument in support of its claims, i.e., but for defendants having loaned money to borrowers to finance the bankruptcy filings and defendants' transfer of the apartments that transformed Mortgage Borrower from a special purpose bankruptcy remote entity, there would be no automatic stay and delay of the foreclosure sale, which is what plaintiff alleges caused its losses.

Contrary to the majority's characterization of plaintiff's claims, the state lawsuit is an attempt to avoid the remedies of the Bankruptcy Code. Indeed, plaintiff filed a motion to dismiss Mezz Borrower's bankruptcy petition, which it withdrew after the court

indicated that it was premature because, were the court to afford plaintiff relief at that early stage, it would have had to adopt the view based on plaintiff's disputed assertions that the proceeding was a two-party dispute with no additional creditors. Such a view would require the court to have disregarded the existence and appointment of the committee of unsecured creditors, and that was "asking a lot of [that] early stage of the case." Rather than pursue remedies under the Bankruptcy Code for the alleged misuse of the bankruptcy system by refiling its motion at the appropriate time and pursuing sanctions, plaintiff seeks to have our state courts decide that defendants' actions were for an improper purpose, caused plaintiff damages, and therefore warrant compensation to plaintiff. But the Bankruptcy Code provides the exclusive remedies for these alleged injuries. As *amicus curiae* Melanie L. Cyganowski, former Chief Judge of the United States Bankruptcy Court for the Eastern District of New York, explains, "[t]he only significance of [d]efendants' allegedly tortious conduct is that it facilitated or affected the nature of, the [b]ankruptcies. The damages [p]laintiff claims to have sustained all resulted from [d]ebtors' bankruptcy filings" (*see* brief for *amicus curiae* Melanie L. Cyganowski at 6). And as *amicus curiae* details, the Bankruptcy Code afforded plaintiff various remedies for that alleged tortious conduct.

The Bankruptcy Code's remedial scheme includes a set of "comprehensive and purposeful procedures designed to achieve uniformity, fairness and efficiency in the administration of bankruptcy cases" (*id.* at 2). The only remedy plaintiff chose to pursue was the credit-bid for debtors' assets under 11 USC § 363 (k), which allowed it to purchase the property at an auction sale, almost one month after filing the underlying tort claims in state court. The United States Supreme Court has explained that "[t]he ability to credit-bid

helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan" (*RadLAX Gateway Hotel, LLC v Amalgamated Bank*, 566 US 639, 644 [2012]).[9] Thus, plaintiff simultaneously invoked remedies from federal and state courts to address damages flowing from the bankruptcy filings—exactly the type of dual proceedings Congress sought to preempt.[10]

Apart from incorrectly approving state litigation of issues that fall squarely within the exclusive jurisdiction of the bankruptcy court, the majority's decision will affect debtor access to bankruptcy remedies and the "fresh start" allowed by Congress. The fear of state litigation may disincentivize lawyers and potential secondary lenders from assisting

---

[9] As *amicus curiae* notes, had Mortgage Borrower been a "single asset real estate" debtor, at most the earliest date upon which plaintiff could have obtained relief from the automatic stay under 11 USC § 362 (d) (3) would have been on July 5, 2016 (Cyganowski brief at 13 n 4). Plaintiff purchased the property under its winning credit-bid on December 13, 2016, meaning that Mortgage Borrower's changed status as a "single asset real estate" debtor resulted, at most, in a delay of approximately six months (*id.*).

[10] The majority makes the remarkable assertion that "defendants do not claim that any remedy was available to plaintiff in the bankruptcy proceedings to compensate plaintiff for *defendants'* alleged wrongdoing" (majority op at 19). Defendants have described several remedies plaintiff could have sought during the bankruptcy proceedings to prevent, mitigate, or recoup the alleged damages plaintiff requests in state court, remedies further detailed by *amicus curiae* former Chief Judge Cyganowski. For example, plaintiff could have moved to dismiss the bankruptcy cases on the ground that they were filed in bad faith (*see* 11 USC § 1112 [b]), moved to lift the automatic stay (*see* 11 USC 362), or sought sanctions for filing a meritless claim (*see* Fed R Bankr P 9011). Had plaintiff pursued its initial motion and succeeded, there might well be no injury to remedy. Further, the majority has failed to identify, because it cannot, what would be plaintiff's damages were borrowers not to have filed for bankruptcy.

debtors who wish to file for bankruptcy but need legal counsel and financial assistance to do so, impacting those with the little to no resources and a low credit rating (*see* brief for *amicus curiae* Legal Services NYC Bankruptcy Assistance Project, for defendants-respondents, at 6-8; brief for *amicus curiae* Bullard Group at 15-16 ; *see also* Alana Abramson, "People are Very Scared." Why Small Businesses Hit by Coronavirus Are Struggling to Get Emergency Loans [Apr. 9, 2020, 3:41 PM] [explaining that "(i)t may be the companies most in need of assistance" during the coronavirus pandemic that "are the companies that don't have a current banking relationship"]; Paul Kiel, *What Happens When You Can't Afford to Go Bankrupt*, Washington Post [Mar. 2, 2018, 3:28 PM] ["Scores of people considering bankruptcy told me the same thing again and again: if they had $1,000 to pay an attorney, then they probably wouldn't need to file (for bankruptcy) in the first place"]; David Skeel, Bankruptcy and the Coronavirus 5, Brooklings [2020] ["The costs of bankruptcy for small and medium-sized businesses are substantial—often 30% of the value of the business—and two-thirds are liquidated rather than reorganizing"]; Chrystin Ondersma, *Small Debts: Big Burdens*, 103 Minn L Rev 2211, 2233 [2019] ["Although purportedly designed to keep out high-income debtors, the effect of the 2005 amendments (to the Bankruptcy Code) has been to reduce access for the poorest debtors who cannot afford the increased fees and who have difficulty navigating the complex technical rules without attorneys"]). The majority opines that state claims against attorneys and debt counseling entities are likely to fail (majority op at 22). And yet this is the first time our Court has addressed the viability of a claim for tortious interference with contract against a nondebtor. It remains to be seen as to what other parties shall be subject to the ruling

here, notwithstanding the majority's speculative "optimism" about the narrow class of defendants who will be dragged into state court by litigious lenders.

IV.

According to the majority, plaintiff's state claims for tortious interference with contract against defendants "are peripheral to, and do not impugn, the bankruptcy process" (majority op at 14). That conclusion will come as a surprise to defendants who plaintiff alleges were parties to a "scheme" that depended on and succeeded only by virtue of borrowers' bankruptcy filings. It is also contrary to Congressional intent in enacting our reticulated Bankruptcy Code with remedies for a party aggrieved by the type of manipulation of the bankruptcy system alleged by plaintiff in its state action. And I do not anticipate it will be well-received by the bankruptcy courts, which have exclusive jurisdiction over bankruptcy filings and sole authority to determine whether a bankruptcy petition is filed in bad faith.

Notably, this plaintiff recovered $86 million as a creditor in the bankruptcy proceeding, achieved its goal of purchasing the property from one of the borrowers, and obtained a $24 million judgment against the loan guarantors. Plaintiff obtained everything our federal and state legal systems allow. Plaintiff's state action is merely an attempt to avoid litigating in bankruptcy court the impact of defendant's alleged scheme to manipulate plaintiff's status as a creditor of the bankruptcy petitioners. Put another way, plaintiff's state action is for damages incurred by the delay in purchasing the property that resulted from borrowers filing for bankruptcy. If there's no bankruptcy filing, there's no delay, and no damages. Without damages, there is no viable state claim. There is nothing peripheral

about that. The majority plainly misconstrues the matter when it suggests that "this is not a situation where state and federal law provide 'two separate remedies' for identical grievances" (majority op at 19). The voluminous record before us tells a different story.

In sum, plaintiff's complaint is "self-consciously and entirely one which seeks damages for a claim filed and pursued in the bankruptcy court" (*MSR Expl.*, 74 F3d at 912). Plaintiff "allege[s] state law tort causes of action for damages entirely predicated upon the filing and prosecution of" the bankruptcy petitions (*In re Miles*, 430 F3d 1083, 1093 [9th Cir 2005]). Therefore, plaintiff's claims are preempted by federal law. I dissent.

Order reversed, with costs, and case remitted to the Appellate Division, First Department, for consideration of issues raised but not determined on the appeal to that Court. Opinion by Judge Stein. Chief Judge DiFiore and Judges Wilson and Feinman concur. Judge Rivera dissents and votes to affirm in an opinion in which Judges Fahey and Garcia concur.

Decided November 24, 2020